13264

STATE v. WOODHAM *ET AL.*

(160 S. E., 885)

Messrs. Mendel L. Smith, R. D. Epps, R. H. Singletary, H. C. Jennings and W. P. Baskin, Jr., for appellants, ▮

Messrs. Frank A. McLeod, Solicitor, R. E. Dennis, C. B. Ruffin and Cole L. Blease, for the State.

November 3, 1931.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

Under an indictment charging the defendants, Willis J. Woodham and Alva L. Woodham, with the murder of Maxie McKenzie, they were tried at the March, 1930, term of the Court of General Sessions for Lee County, before Judge William H. Grimball and a jury. Both defendants

were convicted of manslaughter. Thereafter, a motion for a new trial being refused, they were duly sentenced to serve a term of two years' imprisonment. From the judgment and sentence of the Court the defendants have appealed to this Court upon exceptions imputing error to the trial Judge in several respects.

The homicide occurred in Lee County at the intersection of the Stokes Bridge and Bishopville and Ashland public roads— important highways in that section—in front of a store operated by Tracy Skinner and his father, Midge Skinner, and grew out of a dispute over a land line. The testimony is not clear as to when the dispute arose, but it had continued for, perhaps, several months. On the morning of the tragedy the deceased and the defendant Alva Woodham met up at the disputed line. Just what passed between these parties at that point we have only the statement of this defendant, for, while the parties were seen from a distance by others, no one was close enough to hear what conversation took place. The deceased had a mule and plow, and he was seen to drive away with this defendant, Alva Woodham, walking along the road near him. One witness stated that Alva Woodham was walking by the side of the deceased in the road going in the direction of the said crossroads where the Skinner store was located. Soon after these parties, the deceased and the defendant Alva Woodham, reached the crossroads, in front of the Skinner Store, the killing occurred. As to just how it occurred the testimony is in sharp conflict. Counsel for appellants contend that it was a plain and obvious case of self-defense, while the State contends that it was an unlawful killing. In support of the contention of the appellants as to what occurred at that time, we quote the following from the testimony of the defendant Alva Woodham:

"A. We stood there at the land line and talked. I told Mr. McKinzie, 'It is time to get surveyors and settle this thing; I want to get it settled.' I went over the same thing, that we

would get a surveyor each and let it get settled. He didn't say whether he would or would not. He asked me if I intended to plant anything there and I said no. He turned and went on down to the store and I went on down with him.

"Q. Did he attempt to do anything with the plow? A. No, sir.

"Q. Did he say why he brought the mule and plow? A. No, sir.

"Q. All right, go ahead. A. We walked on down to the store. Just as we got to Tracy Skinner's store, I turned and walked over to the store, and he walked toward Pate's store. As we parted, I said. 'Mr. McKinzie, get that surveyor next week.' I said, 'If we are not going to settle it, I might as well go ahead and plant it.' He said it wouldn't be good for me if I did; my father spoke up—

"Q. Where was your father? A. In Tracy Skinner's store porch.

"Q. Had you communicated with your father in any way? A. No, sir.

"Q. Had you been by your father's house any time that morning? A. No, sir.

"Q. So far as you know, did your father know of any fuss between you and Mr. McKenzie that day? A. No, sir. My father spoke up and said, 'Mr. McKenzie, it looks like you and Alva could get a surveyor and have that thing settled, and not be fussing about it.' Mr. McKenzie said, 'It looks like it can't be settled.' My father said, 'No, I didn't expect a dago to settle it.' Mr. McKenzie said, 'I am tired of taking your damn foolishness,' and run his hand in his pocket and took out a knife and come five or six steps towards him, and run his hand in his pocket and took out a pistol with his handerchief around it, and come right on toward me. My father come down the steps where I was. I told Mr. McKenzie not to have any trouble, to go back. He come right on. Mr. Hinson didn't get the plow; when he saw Mr. McKenzie take out the knife, he walked around behind him

telling him don't do that. Mr. McKenzie come right on up, and my father run around behind Mr. Hinson, and I went around on one side, and Mr. McKenzie run around on the other side and run around Mr. Hinson and cut my father on the arm.

"Q. Did you see Mr. McKenzie cut your father? A. Yes, sir.

"Q. All right. A. He run off five or six steps from me, and I said, 'Look out, Pa, he is going to shoot,' and he shot me in the leg.

"Q. How far were you standing from your father? A. About two feet.

"Q. Were you between him and your father? A. Just to one side.

"Q. All right. A. After he shot me, he snapped the pistol at me.

"Q. What was he doing with his other hand? A. He was holding his knife in it. He was working the pistol that way (indicating) ; I didn't know what else to do so I made at him. He saw me going into him and he struck the pistol into me like that (indicating), and I knocked it out of his hand.

"Q. How did he have it when you knocked it out of his hand? A. Like that (indicating). When I knocked it out of his hand he took his knife in his hand and run on after me, and I run over into the setback; he turned then and went after my father, and I took out my knife and went after him.

"Q. Up to that time did you have your knife out? A. No, Sir.

"Q. Mr. Skinner said yesterday that you came up to the store with your knife open, is that true or not? A. No, sir.

"Q. In what direction did Mr. McKenzie go after he turned away from you? A. He went over towards Pate's store.

"Q. Why did he go across the road towards Pate's store? A. He was after me.

"Q. Were you trying to get out of his way? A. I was trying to get out of his way. He turned back toward my father. Tracy Skinner ran between him and my father, and I holloed to Mr. McKinzie not to do that, and he turned back on me.

"Q. Where was your father standing? A. Over in the road.

"Q. What was the position of his arms? A. Down.

"Q. What about his good arm? A. Hanging down. Then he turned on me and cut at me. We cut at each other two or three times, I guess. He come so near cutting my throat, I jumped back like that (indicating), and he cut that finger just enough to make it bleed, and he cut at me again and missed me and cut at me again, and I knocked his arm up that way (indicating), and reached under that way (indicating), and cut him.

"Q. Have you the knife with which you cut him? A. Yes, sir.

"Q. This is the knife? A. Yes, sir.

"Q. What do you call that, a barlow? A. Yes, sir.

"Q. When you cut him what occurred? A. Well, he stopped, stood up there; I saw he was bleeding pretty freely.

"Q. Did you make any further attack on him? A. No, sir.

"Q. Could you have finished killing him then, if you had desired? A. Yes, sir. I told Tracy Skinner to get something to cord his arm. Tracy holloed to his mother to bring something. Mr. Hinson took him and walked off, and I went on home. After I got home I heard a whole lot of racket down there again. I looked out and saw Mr. Skinner—"

The following testimony, which we quote from the witness Tracy Skinner, tends to support the position of the State:

"Q. Mr. Skinner, where do you live; I say, where do you live? Lee County? A. Yes, sir.

"Q. You live over at Stokes Bridge? A. Yes, sir.

"Q. Are you the son of Mr. Midge Skinner? A. Yes, sir..

"Q. You work in his store? A. It is our store together.

"Q. You run the store? A. Yes, sir.

"Q. On the 9th of July of last year, were you at that store? A. Yes, sir.

"Q. Tell what happened, just in your own words? A. Alva Woodham and Maxie McKenzie came up to the store, McKinzie with mule and plow, Alva Woodham with knife open in his hand, said to McKinzie, 'That is my God Damn land until some agreement is made.'

"Q. Who said that? A. Alva Woodham.

"Q. All right. A. Alva Woodham steps up on store porch; McKenzie went by about ten steps with a mule and plow. Willis Woodham was on store porch and cursed McKenzie for a God Damn Dago Son-of-a-bitch. McKenzie asked Mr. Woodham what he said, he repeated it. McKenzie said, 'I am tired of taking your dragging.' Willis Woodham took out opened his knife, and he and Alva Woodham both stepped from the porch and advanced on McKenzie, cutting at him. McKenzie stepped back, drew pistol and fired. I picked up pistol and stepped between Alva Woodham and McKenzie. Willis Woodham was still advancing on McKenzie cutting with knife. Alva Woodham stepped around me and advanced on McKenzie, he and Willis Woodham both cutting with knives.

"Q. What happened then? When they started cutting did McKenzie have anything in his hand? A. No.

"Q. What had he done with the pistol, if anything? A. He dropped the pistol.

"Q. Do you know what became of the pistol then? A. I picked it up and stepped between—"

The defendant Alva Woodham claims that he inflicted the wound that produced the death of the deceased.

Adopting the classification of appellants' counsel, the exceptions impute error to the trial Judge in three particulars:

(1) In refusing to admit certain testimony offered by the appellants; (2) in his refusal to charge certain submitted requests; and (3) in regard to certain instructions given the jury in his general charge.

The basis for the first allegation of error is set forth under Exception I, which reads as follows:

Exception I. "1. The presiding Judge erred in refusing to permit the witness, Mrs. Alva Woodham, the wife of the defendant, Alva L. Woodham to testify as follows: 'Then is when I saw the Skinners coming up the road with guns challenging my husband to come out.'

"Specification of error:

"(1) Such testimony was in direct reply to, and intended to contradict, the State's witness, Tracy Skinner, who said that he did not see the occurrence referred to.

"(2) Such testimony related to the conduct immediately after the killing, of H. M. Skinner and Bruce Skinner, who were the father and brother, respectively, of the State's witness, Tracy Skinner, and intended to show the animus and feeling of the parties towards the defendant, Alva L. Woodham.

"(3) Such testimony was a part of the *res gestæ*.

"(4) Such testimony tended to explain the conduct of Alva L. Woodham in leaving his home immediately after the killing and going to the home of his co-defendant."

During the examination by appellants' counsel of the witness Mrs. Woodham, wife of one of the defendants, she stated:

"Q. Could you tell that he (meaning her husband), had been shot? A. Yes, sir; I could tell from the way he was walking. He told me to come on and he would take me to his fathers. *Then is when I saw the Skinners coming up the road with guns challenging my husband to come out.*"

It was to the last statement of the witness, which we have italicized, that counsel for the State interposed objection. The following occurred regarding the same:

"Mr. Ruffin: Your Honor, we submit that is not competent, what happened at the house.

"The Court: Mr. Jennings, how is that relevant?

"Mr. Jennings: Well, only to show the attitude of the Skinners in the case, their star witness.

"Mr. Ruffin: We are not trying the Skinners; have no connection with the case at all.

"The Court: I don't think it is relevant, Mr. Jennings; I will have to sustain the objection.

"Mr. Epps: Of course, your Honor, we don't wish to present that matter again, except from this viewpoint. It seems to us that, inasmuch as Mr. Willis Woodham—Mr. Alva Woodham is charged with murder, it would be proper to show his attitude when these people came up with guns. It seems to us proper to show his attitude, whether he was mad and wanted to fight or whether he was peaceably inclined, as the jury can judge of his temper.

"The Court: I think I will sustain the objection."

In our opinion, the trial Judge made a proper ruling. Alva Woodham's home, the place where the witness was at the time she said she saw the Skinners coming there, is 482 feet from the scene of the killing. She did not testify that she saw either of the Skinners at the scene of the homicide at the time of the same. Therefore, the statement that the Skinners came to her house after the homicide could in no sense be considered proof of Tracy Skinner having seen the killing and it was incompetent for such purpose. Furthermore, it would have made no difference if Tracy Skinner had seen the occurrence, which, it seems, appellants desired to establish, for the reason that the matter involved in the testimony offered was a collateral matter. The alleged error cannot be sustained under the first specification.

As to the second specification, under this alleged error, we deem it sufficient to call attention to the fact that the parties named therein, H. M. Skinner and

Bruce Skinner, were not witnesses in the case. We fail to see any merit in their contention.

As to the third specification, that such testimony was ██ a part of the *res gestæ,* the same cannot be sustained, in the first place, for the reason that the testimony was not offered for that purpose and the trial Judge was not afforded an opportunity to consider it from that viewpoint; and, second, under the circumstances of the case, it was too far removed, in point of time and space, from the homicide in question.

The fourth specification of error under the first exception ██ ception is that the testimony offered "tended to explain the conduct of Alva L. Woodham in leaving his home immediately after the killing and going to the home of his co-defendant." What the defendant Alva Woodham did at his home after leaving the scene of the killing some distance away, some time afterwards, and his attitude toward the Skinners at his home, could have no bearing on the issue before the Court. In this connection we desire to state that the admission of testimony and the refusal to admit testimony offered must necessarily, for the most part, be trusted to the wise discretion of the trial Judge because of his opportunity to understand and appreciate the situation, and unless it clearly appears that his Honor's ruling is contrary to the established rules governing the admission of testimony, and that such ruling is clearly prejudicial to the rights of the complaining party, this Court will not reverse a judgment of the lower Court because of such alleged error. Exception I must be overruled.

Exception II is a repetition of Exception I, imputing error to the trial Judge for refusing to grant a new trial because of such alleged error. For the reasons assigned in our consideration of Exception I, the same is overruled.

The second question which appellants present to the ██ Court, based on the allegations of error charged under the third, fourth, seventh, eighth, ninth, and

tenth exceptions, is: "Whether in a homicide case, where the defendant relies upon the plea of self-defense, the application of insulting or opprobrious language to the deceased absolutely deprives him of the right to the plea, *regardless of his intention in the use thereof,* and denies him the right to defend himself against the murderous attack prompted by this provocation alone." Briefly stated, the question presented by appellants is: "Can a person use opprobrious language or vile epithets toward another, thereby provoking a difficulty, and then be entitled to set up the plea of self-defense to an assault which was caused by the use of such language?"

The rule regarding the use of opprobrious language was stated by Mr. Chief Justice Pope, as the organ of this Court, in the case of *State v. Rowell,* 75 S. C., 506, 56 S. E., 23, 29, in the following language: "The true rule is that the plea of self-defense is not available to one who uses language so opprobrious that a reasonable man would expect it to bring on a physical encounter, and which did actually contribute to bringing it on."

On this issue Judge Grimball charged the jury as follows: "That the rule in South Carolina is that self-defense is not available to a person who uses such language, so opprobrious, as is reasonably calculated to bring on a difficulty, and which does actually contribute to the bringing on of a physical encounter. The true rule is that self-defense is not available to a person who uses language so opprobrious as is reasonably calculated to bring on a difficulty and which really does contribute to a physical encounter."

We see no error as charged, and the exceptions alleging this error have to be overruled.

The third question presented by appellants, which appellants base on the allegations of error charged under Exceptions 5, 6, 11, 12, and 13, is: 'What is essential to constitute a case of justifiable homicide in this State based upon an

alleged killing: (a) in the defense of the life of another person (b) to prevent the commission of a felony?"

The facts involved in the case having a bearing on this question were referred to by us at the beginning of this opinion, and we quoted from the record testimony which tended to support the contention of the parties as to what transpired at the scene of the killing and how the killing occurred. The law of this State on this issue is stated in the case of *State v. Cook,* 78 S. C., 253, 59 S. E., 862, 864, 15 L. R. A. (N. S.), 1013, 125 Am. St. Rep., 788, 13 Ann. Cas., 1051. The opinion in that case was written by Mr. Justice Woods, in which he expressed the rule thus: "We have endeavored to show the law as laid down by the Circuit Judge is firmly established. It is true the rule may in exceptional cases work hardship; but the opposite rule would allow the innocent man who had been forced to strike in self-defense to be killed with impunity, merely because appearances happened to be against him at the moment a partisan of his antagonist reached the scene of conflict. The duty seems urgent to enforce rather than relax the rule which admits of no excuse for taking human life except necessity."

This statement of the law was quoted with approval in the case of *State v. Hays,* 121 S. C., 164, 113 S. E., 362, the opinion in which case was written by Mr. Justice Marion, and concurred in by the entire Court. The charge of Judge Grimball in the case at bar was in accord with this rule, which is the established law of this State. The exceptions raising this question are, therefore, overruled.

While we have not made specific reference herein to every position presented by appellants' counsel, we have given due consideration to the same, and after a careful study of the entire record in the case before us, we are of the opinion that the appellants got a fair trial. Therefore, the exceptions must be overruled, and it is the judgment of this Court that

504

the judgment of the lower Court be, and the same is hereby, affirmed.

MR. CHIEF JUSTICE BLEASE and MR. JUSTICE STABLER concur.

MR. JUSTICE COTHRAN (concurring in result) : I concur in the result of this opinion. I assume that the Court is disinclined to overrule the cases of *State v. Rowell,* 75 S. C., 494, 56 S. E., 23, and *State v. English,* 115 S. C., 535, 106 S. E., 781, and upon that assumption I feel bound by them. I still cannot appreciate the justice of depriving the accused of the right to defend himself against an attack which resulting fatally would be *murder* in his assailant, although he may have precipitated the difficulty by opprobrious epithets; "no words will justify an assault."