500 S.E.2d 489

**STATE of South Carolina, Respondent,**

v.

**Willie WIGGINS, Appellant.**

**No. 24791.**

Supreme Court of South Carolina.

Heard Dec. 2, 1997.

Decided May 18, 1998.

Rehearing Denied June 17, 1998.

540

Jack B. Swerling, Columbia, for appellant.

Charles Molony Condon, Attorney General, John W. McIntosh, Deputy Attorney General, Salley W. Elliott, Assistant Deputy Attorney General, Charles H. Richardson, Senior Assistant Attorney General, Columbia; and C. Gordon McBride, Solicitor, Fourth Judicial Circuit, Darlington, for respondent.

WALLER, Justice:

On January 2, 1995, Appellant Willie Wiggins was indicted for the murder of Robert Clayton Hood ("Victim"). Following a jury trial, Appellant was convicted of voluntary manslaughter [1] and sentenced to ten years' imprisonment. We affirm.

## FACTS

Appellant and his wife operate the Bennettsville Motel ("Motel"). Attached to Motel is a restaurant named the

---

1. At the close of the State's case, the trial judge directed a verdict of acquittal on the murder charge, but submitted this lesser-included offense to the jury.

Launch Pad, and a bar named the Silver Moon. Victim was a frequent patron of these establishments. It is undisputed that on the night of October 13, 1994, Victim got into a fight with another patron. Appellant's wife asked Victim to leave and permanently barred him from the premises. Appellant was not present. Victim was very reluctant to leave and had to be persuaded to do so by a family member.

Sometime around mid-day on October 14, 1994, Victim returned to Motel. He first met with Appellant. Victim and Appellant had an ongoing arrangement where Victim would borrow money from Appellant using his gun as collateral. On this day, Victim repaid an outstanding debt to Appellant, who then returned Victim's gun.[2] When Victim indicated he wanted to discuss the events of the night before, Appellant told him his wife had made the decision to bar him from the restaurant/bar and if he had a problem with it he would have to talk to her. Appellant then took Victim to speak to his wife and left. An argument developed between Victim and Appellant's wife because Victim was upset he was the only person who had been barred (not the person with whom he was fighting). When Appellant's wife stuck to her decision, Victim angrily left Motel.

A few hours later, Victim's sister ("Sister") arrived at Motel, demanding to speak with Appellant's wife. Appellant told Sister his wife was not there and asked if he could help her. Sister responded she had come to confront his wife regarding her decision to bar Victim from the premises. Appellant testified she was angry and threatened to physically attack Appellant's wife. He told her no one was going to attack his wife, and warned he would call the police if she came back to cause trouble. He also told her if she came back and tried to attack his wife, he would "kick her ass." Sister responded she was going to bring the "whole Hood family" back to Motel later that night to "shut the place down."[3]

---

**2.** This gun was not the gun in Victim's possession when the fatal incident occurred later that afternoon.

**3.** Sister denied making any threats. She claimed she only asked where Appellant's wife was and said she would return.

As Sister was leaving, Victim's brother ("Brother") arrived, apparently to try to calm her down. Brother and Sister were in Motel's parking lot, preparing to leave, when Victim drove up. Victim was sitting in Sister's car, talking to her, when Appellant came out of Motel.[4] Appellant walked over to the passenger side of Sister's car, where Victim was sitting. Victim had one foot in the car and one foot on the ground, with the door open. Testimony regarding the subsequent events was, unsurprisingly, highly contradictory.

Sister testified Appellant was leaning into the car talking to her and Victim. He told them he was going to call the police if they did not leave. Victim replied he did not come looking for trouble; he had only come to get Sister.[5] Sister, however, continued arguing with Appellant. She had informed Victim Appellant had threatened to kick her ass.[6] Victim asked Appellant if he said that and Appellant denied it. Sister accused Appellant of lying. Appellant then stated, " 'Yes, I said it. I'll kick both of your asses.' " Victim responded, "We'll settle this," and turned to get out of the car. When he turned, Sister saw a gun clipped to Victim's back (Victim's back was not to Appellant). She then saw Appellant had a gun in his hand. She had exited the car when Appellant began shooting.[7] Victim did not reach for his gun until he had already been hit by Appellant with the first shot. Victim never was able to pull the gun out and fire it, however; the gun fell to the ground. After Victim was hit with the first shot, he exited the car and began running toward the rear, at which point his back was to Appellant, who continued firing the gun. Victim fell to the ground and was carried to the hospital by Sister, where he died. Sister unequivocally stated Victim never had a gun in his hand, or pointed a gun at

**4.** The State presented testimony Victim was in the parking lot for less than one minute before Appellant confronted him.

**5.** Brother testified the reason he went to get Sister from Motel was at the behest of Victim.

**6.** It is unclear whether Sister told Victim this before or after Appellant confronted them.

**7.** Appellant's gun was fired four times. Testimony consistently showed the shots were fired in rapid succession.

Appellant, while he was sitting in the car or before Appellant began shooting.

Brother, who was standing outside of, but close to, Sister's car, testified he heard Victim tell Appellant he did not want any trouble and that they were leaving. He did not hear any other conversation besides Sister calling Appellant a liar. As Victim was getting out of the car, Appellant pulled a gun out of his right back pocket and began firing. Victim did not have a gun in his hand. Brother saw Victim reach for his gun after Appellant fired the first shot. Victim began staggering towards the back of the car as Appellant continued firing. At some point after the first shot, Brother shouted for Victim to shoot Appellant. Victim never raised his gun or pointed it at Appellant; the gun fell from Victim's hand as he was being shot. Before Victim reached for his gun, Brother did not know he had one (i.e. he could not see it from where he was standing—which was directly behind Appellant).[8]

Appellant gave a very different version of events. He testified he armed himself with a gun after Sister left Motel because he was going home, and it was his habit to take his gun home. When Victim showed up outside, he did not think there would be any problem because he thought they were on good terms. He had never had problems with him that could not be talked out. When he asked Victim to leave the first time, Victim ignored him (or did not hear him). He forthrightly told Victim he had threatened to "whip [Sister's] ass" (he testified he never denied saying it), but told Victim he did not mean it. He told Victim they did not need any problems, to which Victim responded, "Yeah, we've got problems." Victim got out of the car, took his sunglasses off with his right hand, and with his left hand pulled out a pistol.[9] Victim cocked and pointed the gun at Appellant.[10] As Victim was

---

**8.** An additional eyewitness for the State testified he saw Appellant back away from the car and begin shooting as Victim was getting out of the car. Victim did not have a gun in his hand at the time. Victim was running to the rear of the car, acting "like he was trying to run from the bullets." At one point his back was to Appellant while Appellant was still shooting.

**9.** Brother and Sister testified Victim was right-handed.

**10.** A desk clerk working in Motel also testified Victim pulled a gun on Appellant.

exiting the car, Brother was yelling, "Shoot him, Clay." Appellant got scared, pulled his own gun and fired.

An autopsy revealed Victim died of three "distant" gunshot wounds, two in the chest and one in the back. No powder burns were associated with the wounds. No gunpowder residue was found on Victim's hands. The trajectory of one of the chest wounds indicated it was fired from a downward angle. From the relative sizes of Victim and Appellant, the pathologist opined this downward angle was consistent with Victim getting out of a car and Appellant standing outside of the car when the shot was fired because Victim would have to be lower than the gun. Victim's blood alcohol level was .019%.

## ISSUES

I. Did the trial judge err in refusing to direct a verdict of acquittal because Appellant was acting in self-defense as a matter of law?

II. Did the trial judge err in submitting the issue of voluntary manslaughter to the jury?

III. Did the solicitor's remarks during opening and closing argument prejudice Appellant's right to a fair trial?

## DISCUSSION

### I. Self–Defense

■ Appellant argues the trial judge should have directed a verdict of acquittal because the State failed to provide evidence sufficient to negate his claim of self-defense (i.e. because Appellant was acting in self-defense as a matter of law). We disagree.

■ At one time, self-defense was an affirmative defense in this State, and a defendant bore the burden of establishing it by a preponderance or greater weight of the evidence. *State v. McDowell*, 272 S.C. 203, 249 S.E.2d 916 (1978). However, current law requires the State to disprove self-defense, once raised by the defendant, beyond a reasonable doubt. *See State v. Fuller*, 297 S.C. 440, 443, 377 S.E.2d 328, 330 (1989); *State v. Bellamy*, 293 S.C. 103, 105, 359 S.E.2d 63, 64–65 (1987), *overruled on other grounds, State v. Torrence*, 305 S.C.

45, 406 S.E.2d 315 (1991) ("It is clear that the defendant need not establish self-defense by a preponderance of the evidence but must merely produce evidence which causes the jury to have a reasonable doubt regarding his guilt.").

■ "When ruling on a motion for a directed verdict, the trial judge is concerned with the existence of evidence, not its weight. When this Court reviews the denial of a motion for a directed verdict, it views the evidence in the light most favorable to the non-moving party, and if there is any direct or substantial circumstantial evidence which reasonably tends to prove the guilt of the accused or from which guilt may be fairly and logically deduced, refusal by the trial judge to direct a verdict is not error." *State v. Long*, 325 S.C. 59, 480 S.E.2d 62 (1997). *See also* William S. McAninch & W. Gaston Fairey, The Criminal Law of South Carolina 483 (3d ed. 1996) (Supp. 1997 at 77) ("Reversal of a conviction because of the trial court's refusing to give a directed verdict on the ground of self-defense is rare").

■ The basic definition of when a person is justified in using deadly force in self-defense is comprised of four elements:

(1) The defendant was without fault in bringing on the difficulty;

(2) The defendant must have actually believed he was in imminent danger of losing his life or sustaining serious bodily injury, or he actually was in such imminent danger;

(3) If the defense is based upon the defendant's actual belief of imminent danger, a reasonable prudent man of ordinary firmness and courage would have entertained the same belief. If the defendant actually was in imminent danger, the circumstances were such as would warrant a man of ordinary prudence, firmness and courage to strike the fatal blow in order to save himself from serious bodily harm or losing his own life; and

(4) The defendant had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did in this particular instance.

*State v. Davis*, 282 S.C. 45, 46, 317 S.E.2d 452, 453 (1984). We find, viewing the evidence in the light most favorable to the

State, that sufficient evidence was produced at trial to submit this issue to the jury.

Appellant argues he was clearly without fault in bringing on the difficulty because he was ejecting Victim, a trespasser, from his business premises. He relies on *State v. Brooks*, 252 S.C. 504, 167 S.E.2d 307 (1969), for this proposition. *Brooks* held:

> [I]f in the exercise of the right by a proprietor to eject a trespasser from his premises, the proprietor is assaulted by the trespasser and subjected to the danger of losing his life or of receiving serious bodily harm as would justify the killing of the assailant under the right of self-defense, obviously, he would have the right to stand on that defense and if, in fact, engaged in the legitimate exercise in good faith of his right to eject, he would in such case be without fault in bringing on the difficulty. . . .

*Id.* at 510, 167 S.E.2d at 310. In *Brooks*, the issue was whether this law should have been charged in a case where a fight broke out in a tavern parking lot as the managers (defendants) were allegedly trying to evict an unruly patron.[11] In finding such a charge warranted, the Court stated, "Whether the appellants were acting in good faith in attempting to eject [the victim], and while so doing [the victim] assaulted them, was a question of fact for jury determination." 252 S.C. at 511, 167 S.E.2d at 310. The Court did not hold the defendants were, as a matter of law, without fault in bringing on the difficulty. It held they were entitled to have a jury consider the issue. *See also State v. Starnes*, 213 S.C. 304, 49 S.E.2d 209 (1948) (because of conflict of testimony regarding facts, refusing to hold as a matter of law that defendant was entitled to act as he did in ejecting patrons).[12]

---

11. The managers testified after the victim left, he returned and kicked open the door of the tavern, armed with a pistol and cursing. When they all went outside, the victim grabbed a gun and started firing after threatening to kill the managers. Only after the victim started firing did the manager fire his gun. Aside from the fact that *Brooks* had the exact opposite procedural posture of that here, its facts are clearly distinguishable when viewing the light of the current evidence most favorably to the State.

12. We note the judge did not charge this aspect of self-defense, and the record contains no evidence Appellant requested such a charge.

Here, evidence was presented by the State that Victim was in the process of leaving and told Appellant he did not want any trouble. Furthermore, Appellant threatened to kick "both [Victim's and Sister's] asses." We find this evidence raised a question of fact regarding whether Victim assaulted Appellant, and whether Appellant was exercising good faith in attempting to eject when the shooting occurred. *See also State v. Woodham*, 162 S.C. 492, 502, 160 S.E. 885, 889 (1931) (one can bring on difficulty by using "language so opprobrious that a reasonable man would expect it to bring on a physical encounter, and which did actually contribute to bringing it on.") (internal quotations omitted); 40 Am.Jur.2d *Homicide* § 147 (1968) ("Threats made by the accused against the deceased may be considered sufficient provocation").

 We similarly decline to find the evidence established the second and third elements of self-defense as a matter of law.[13] Appellant certainly realized Victim owned at least one gun, and he knew Victim had a tendency to get into fights. However, he never testified he thought or was afraid Victim was carrying a gun when he went out to the parking lot. Further, he testified he did not think anything would happen when he went out to the parking lot because he had always been able to reason with Victim. He thought they were friends.[14] Under these circumstances, we do not find that, as a matter of law, Appellant actually believed he was, or actually was, in imminent danger of serious bodily injury or loss of life. Nor can we conclude that, as a matter of law, a reasonable person would, in the same situation with this same past history, feel justified in striking a fatal blow. The fact that Victim turned out to have had a gun in his possession does not automatically provide justification for this shooting when there is evidence in the record showing Appellant was unaware he

---

13. In this analysis, we are assuming, as several State's witnesses testified, that Victim did not initially pull his gun on Appellant. This issue would be much more favorable to Appellant if the evidence were uncontradicted that Victim cocked a gun and pointed it at him.

14. Although Appellant emphasizes Victim's blood alcohol level, he never testified he thought Victim was under the influence of alcohol, or that this was part of the reason he acted as he did.

had it. Furthermore, Appellant continued shooting, even when Victim was falling to the ground and turning away from him.[15]

Our recent opinion in *Long* rejected this same argument under similar facts. *See Long*, 325 S.C. 59, 480 S.E.2d 62. In that case, Long killed his stepson after a confrontation which occurred in Long's home. The victim was angry with Long because Long had reported to police that the victim had stolen a bicycle. Long was in his bedroom when the victim began beating on the door with a baseball bat and arguing with him.[16] Long opened the door and immediately shot the victim. Long testified he thought the victim was using drugs at the time and he was afraid of him when he used drugs. He testified the victim had been over at the house the day before with a gun. Further, there was a history of ill feeling between the two. We rejected Long's argument he was entitled to acquittal because he was acting in self-defense as a matter of law, stating, "While self-defense can be inferred even from the State's version of the evidence, the evidence of self-defense is not conclusive." *Id.* at 63, 480 S.E.2d 62.[17]

We find the State presented sufficient evidence to create a jury issue regarding whether Appellant was acting in self-defense or was guilty of voluntary manslaughter.

---

**15.** We agree with Appellant's argument that under the fourth element he was under no duty to retreat because the incident occurred in the parking lot of his place of business. There is no duty to retreat where an attack occurs in one's home or place of business. We have followed the general rule that the absence of a duty to retreat also extends to the curtilage of a home. *See also* 40 Am.Jur.2d § 168 ("curtilage" includes outbuildings, yard around dwelling, garden). We now clarify the law that, consistent with this "curtilage rule," the absence of a duty to retreat on one's place of business applies to the business parking lot. *See Brooks*, 252 S.C. 504, 167 S.E.2d 307 (noting if proprietor was exercising good faith attempt to eject and was assaulted, he would have no duty to retreat; shooting occurred in parking lot outside tavern).

**16.** The victim did not reside in the same home with Long.

**17.** *Long* distinguished our opinion in *State v. Hendrix*, 270 S.C. 653, 244 S.E.2d 503 (1978), which is the case Appellant is primarily relying on, on the basis that in *Hendrix* the victim was carrying a gun and advancing towards the defendant, showing he was "clearly in imminent danger." *Id.* at 64, 480 S.E.2d 62.

## II. Voluntary Manslaughter

■ Appellant argues the judge erred in submitting the issue of voluntary manslaughter to the jury because there was no evidence he committed this offense. We disagree.

■ Voluntary manslaughter is defined as the intentional killing of a human being in the sudden heat of passion resulting from a sufficient legal provocation. *State v. Nichols*, 325 S.C. 111, 481 S.E.2d 118 (1997). " 'Sudden heat of passion upon sufficient legal provocation' that mitigates a felonious killing to manslaughter must be such as would naturally disturb the sway of reason, and render the mind of an ordinary person incapable of cool reflection, and produce what, according to human experience, may be called an uncontrollable impulse to do violence." *State v. Lowry*, 315 S.C. 396, 399, 434 S.E.2d 272, 274 (1993) (quoting *State v. Gardner*, 219 S.C. 97, 64 S.E.2d 130 (1951)). To warrant a court's eliminating the offense of voluntary manslaughter, it should "very clearly appear that there is no evidence whatsoever tending to reduce the crime from murder to manslaughter." *Id.*

We find there is evidence in the record which would tend to show Appellant acted in sudden heat of passion upon sufficient legal provocation. Appellant was in a heated argument with Victim and Sister. He testified he was afraid for his life because Victim physically threatened him. Contrary to his argument, fear can constitute a basis for voluntary manslaughter. *See State v. Franklin*, 310 S.C. 122, 125, 425 S.E.2d 758, 760 (Ct.App.1992) (mind can be rendered incapable of cool reflection by "exasperation, rage, anger, sudden resentment, or terror"). *See also Lowry*, 315 S.C. at 396, 434 S.E.2d at 272 (properly charged relying on evidence victim and defendant were arguing and victim was about to initiate a physical encounter when shooting occurred); *State v. Gilliam*, 296 S.C. 395, 397, 373 S.E.2d 596, 597 (1988) ("Appellant's testimony that the victim threatened him and then fired at him would support a finding of sufficient legal provocation and heat of passion"). We therefore affirm the trial court's submission of this offense to the jury.[18]

---

18. We reject Appellant's argument voluntary manslaughter cannot be submitted because he claimed he acted in self-defense. We have repeatedly held these theories may both be properly submitted where

### III. Solicitor's Arguments

 Appellant argues certain comments the Solicitor made during opening and closing argument violated his right to a fair trial. We disagree.

This argument is not preserved for appellate review because Appellant made no objection to Solicitor's arguments at any point during the trial. *State v. Patterson*, 324 S.C. 5, 482 S.E.2d 760 (1997). In any event, while the comments were arguably outside the record and its inferences, we find they were not so prejudicial as to deprive Appellant of due process by rendering his trial fundamentally unfair. *See State v. Copeland*, 321 S.C. 318, 468 S.E.2d 620 (1996) (Appellant bears burden of establishing argument was so improper it infected the trial with unfairness to the extent that conviction was a

the evidence supports them. *See, e.g., Nichols*, 481 S.E.2d at 122 ("Self-defense and voluntary manslaughter are not mutually exclusive and should both be submitted to the jury if supported by the evidence"); *Lowry*, 315 S.C. at 400, 434 S.E.2d at 274 ("Even though the jury was not convinced that Lowry acted in self-defense, the jury could have discerned, consistent with the evidence, that there was sufficient legal provocation and heat of passion to find Lowry guilty of voluntary manslaughter"); *Gilliam*, 296 S.C. at 396–97, 373 S.E.2d at 597 ("Both self-defense and the lesser included offense of voluntary manslaughter should be submitted to the jury if supported by the evidence. The rationale for this rule is that the jury may fail to find all the elements for self-defense but could find sufficient legal provocation and heat of passion to conclude the defendant was guilty of voluntary manslaughter."). Appellant cites our decision in *State v. Finley*, 277 S.C. 548, 290 S.E.2d 808 (1982), as support for his argument. We find his reliance on *Finley* misplaced.

In *Finley*, the defendant was convicted of murder. On appeal, he argued he was entitled to have the jury instructed that, under the theory of "imperfect self-defense," if they believed he had an actual, although unreasonable, belief he was in imminent danger of bodily harm, they should find him guilty of voluntary manslaughter instead of murder. We affirmed the trial court's refusal to so charge the jury. Here, Appellant has not argued he was entitled to any such additional charge, but is attempting to extend *Finley*'s holding to preclude the submission of voluntary manslaughter as a possible verdict in the first instance. *Finley* did not address this issue; in fact, in that case, the jury received both voluntary manslaughter and self-defense instructions.

denial of due process; Court reviews argument in light of the entire record).

**AFFIRMED.**

FINNEY, C.J., MOORE and BURNETT, JJ., and JAMES R. BARBER, Acting Associate Justice, concur.