THIS OPINION HAS NO PRECEDENTIAL VALUE

THIS
 OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS
 PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of
 Appeals

 
 
 
 The State, Respondent,
 v.
 Reginald Tyrell Clea, Appellant.
 
 
 

Appeal From Sumter County
Clifton Newman, Circuit
 Court Judge
Unpublished
 Opinion No. 2007-UP-552
Submitted
 December 1, 2007  Filed December 14, 2007
AFFIRMED

 
 
 
 Chief Attorney Joseph L. Savitz, III, South Carolina Commission of Indigent Defense, of Columbia, for Appellant.
 Attorney General Henry D. McMaster, Chief Deputy Attorney General
 John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka,
 Assistant Attorney General Melody J.  Brown, all of Columbia; and Solicitor C.
 Kelly Jackson, of Sumter, for Respondent.
 
 
 

PER
 CURIAM: 
 Reginald Tyrell Clea (Clea) was convicted of one count of murder and possession
 of a firearm during the commission of a crime of violence.  He was acquitted on
 a second murder charge.  On appeal, Clea argues the trial judge erred in not
 charging the jury on the lesser included offense of voluntary manslaughter.   We
 affirm.[1]
FACTS
Clea
 admittedly shot and killed Charles Jackson (Jackson) and James Pollard
 (Pollard).  John Lee Powell (Lee) testified he was with Pollard the day of the
 shootings.  Pollard picked Lee up earlier in the day, and they were later
 joined by Maurice Young (Young).  They drove together to Rembert to find Clea
 and buy doghouses from him.  Pollard and Clea had shared a residence prior to
 the shootings and had bred dogs.  Clea left several dogs at Pollards new home,
 and the dogs did not have doghouses.    Pollard paid Clea for the doghouses,
 and all four men amicably loaded them onto Cleas truck.  
The
 group drove to Pollards new home and, as they were unloading, Jackson arrived in his car.  Jackson spoke cordially with Lee and then approached Pollard. 
 The group continued to interact in a friendly manner when Jackson called Clea
 over to Jacksons car so he could show him something.  Lee said Jacksons tone was good natured.  When Lee heard the first shots, his back was to Clea, but
 he turned to see Clea shooting at Jackson.  He asked Clea why he was shooting at
 Jackson, and Clea repeatedly answered that Jackson had a gun.  Clea fired
 again as Jackson crawled through his car to exit the passenger side.  Lee told
 Clea to stop shooting, but Clea again replied Jackson had a gun.  Lee never saw
 Jackson with a gun, nor did he hear shots come from Jacksons direction.
 
Pollard,
 who was near the car, asked Clea why he was shooting at Jackson and Clea turned
 towards him.  As Pollard walked towards Clea repeating his question, Clea
 started shooting at Pollard.  Lee did not see a weapon on Pollard and had no indication
 he was armed.  He heard Clea ask Jackson to show his hand, but Lee was unable
 to observe Jackson who now lay on the ground on the opposite side of the car.  Jackson yelled numerous times for Pollard to tell Clea he didnt have a gun, however
 Pollard had already been shot.  After Lee and Young left the yard, Lee heard
 another set of gunfire.
Young
 testified to being at Pollards home unloading the doghouses.  Soon after Jackson arrived, he heard gunshots and turned to see Clea shoot at Jackson.  He didnt see
 Jackson shoot back and saw no gun other than Cleas.  After the first shots,
 he recalled Clea said Jackson was going to get a gun.  Jackson stated, no, I
 aint got no gun, I aint got no gun.  Young heard Lee tell Clea to put the
 gun down, and he heard more shots as he left the yard.
According
 to Cleas testimony, he sold the doghouses to Pollard as a last detail from
 their having lived together.  He explained he had previous difficulties with the
 victims and knew both had reputations for violence.  The day of the shooting, Pollard
 and Young stopped him on the road to discuss the doghouses.  No one was upset
 and no cross words were exchanged.  Clea helped load the doghouses onto his
 truck, drove them to Pollards residence, and unloaded one with Pollards
 help.  Jackson drove up shortly afterwards, and they worked together to unload
 another doghouse.  
When
 Jackson told Clea he needed to talk with him, Clea reported he was not
 suspicious at first.  But, as he walked toward the car and his truck, a chill
 went up [his] back.  Because he did not want to speak with Jackson, he
 continued towards his truck so [he] could leave.  As Clea was about to sit in
 the truck, he saw Jackson reach into the cars backseat and pick up a shoebox. 
 Jackson continued to call Clea to the car.  While Clea was stalling . . . 
 putting Vaseline on my lips because it was cold, Jackson began talking
 aggressively.  Clea thought Jackson was going to get a gun from the box.  He
 told Jackson, if you want me to come over there, why you dont come to me. 
 And thats when [Jackson] be like, nah, I want you to come to me.  And thats
 when I slammed my backseat back, threw on my jacket and reached for the loaded
 assault rifle.  
Clea
 said he couldnt leave because no safe exit from the yard was available.  [A]t
 first, he didnt think Jackson had a gun; but, when he saw that Jackson was clamping on to something, he thought like, man, forget that and shot at
 the front of the car in which Jackson sat.  He called these first shots
 warning signs, and he told Jackson to let [him] leave from the scene because
 [he] was about to leave anyway.  When Clea demanded let me see your hand, Jackson did not comply.  The solicitor asked Clea:
 

 
 
 Q: 
 Was there anything that he did 
 that provoked you into a fight with him?  Is there anything he 
 did to make you mad?  Did he call you a name or do anything 
 like that that got you heated up?  
 
 
 
 A:  
 What got me heated up was he 
 wouldnt show me his hands. 
 
 
 
 Q:
 All right, what Im trying to 
 ask you is if there was any hostility, if there was anything that 
 got you mad at him, angry at him, outraged at him?
 
 
 
 A: 
 I never said I was mad. 
 
 
 
 
 Q:
 Whats that?
 
 
 
 A: 
 Whoever said I was mad?
 
 
 
 Q: 
 Im asking you that.  Are 
 you telling me you werent mad? 
 
 
 
 A: 
 No, I was just precautious.
 
 
 
 . . . 
 
  
 
 
 Q: 
 Did Mr. Pollard ever say 
 anything or do anything to you that made you mad or angry?
 
 
 
 A: 
 Yeah, when he kept hollering to 
 me and looking for me, wanting me to give an explanation about 
 something that I didnt had no  that I didnt had no right to give 
 him an explanation about.
 
 
 
 . . .
 
  
 
 
 Q:   
 
 Im asking you if Mr. Jackson  
 if Mr. Pollard on this day ever said anything to you or did anything 
 to you that got you mad, that got you outraged?
 
 
 
 A: 
 
 No, sir.
 
 
 
 Q:  
 Did he ever provoke you by 
 calling you a name or by doing anything else, provoke you into the 
 point where you just said you had to shoot him for no other reason?
 
 
 
 A:  
 Yes.
 
 
 
 Q:
 How did he provoke you? 
 
 
 
 
 A:
 By reaching into his waist.
 
 
 
 Q: 
 That made you mad?
 
 
 
 A: 
 No, it didnt make me mad but 
 Im not going to let nobody draw down on me and my life is in 
 danger.
 
 
 
 Q: 
 So you werent made [sic] at 
 him, you werent outraged at him, you were just trying to defend 
 yourself, thats your testimony?
 
 
 
 A: 
 Exactly.
 
 
 
 . . . 
 
  
 
 
 Q:  
 How many steps did [Pollard] get 
 towards you before you dropped him?
 
 
 
 A: 
 About three or four.
 
 
 . . . 
  
 
 
 Q:  
 And then you dropped him.  
 He didnt have anything in his hands, did he?
 
 
 
 A: 
 Nah, but as he was walking he 
 was reaching in his waist.
 
 
 
 Q:  
 Did he have anything in his 
 hands?
 
 
 
 A: 
 I couldnt see his hands.
 
 
 
 Q: 
 Did you ever see his hands?
 
 
 
 A:  
 How could I?
 
 
 
 Q: 
 Did you ever see anything in his 
 hands?
 
 
 
 A: 
 No.  
 
 

Jackson was shot three times and Pollard was shot nine times.  Twenty-seven cartridges were
 recovered from the scene. Twenty-one were determined to have been fired from Cleas gun.  The remaining six cartridges, though inconclusive, were the proper
 caliber for the same gun.  No weapons were found in the yard or in any
 vehicles.  Gunshot residue testing on Pollards right hand indicated lead
 counts higher than would be expected had he fired a gun.  The SLED technician
 found it more consistent with a hand being on the muzzle end of a gun.  From
 the residue found on Jacksons hand, the technician reasoned he either could
 have fired a gun or a gun was fired in his vicinity.  Testing of the shoebox
 was positive suggesting a gun had been placed in the box after being fired or
 that the box was open when a gun was fired nearby.  
Defense
 counsel requested a charge on voluntary manslaughter arguing the appearance of
 danger or the gesture of reaching for a weapon can adequately provide the
 necessary provocation.  The State objected stating no evidence showed sudden
 heat of passion or sufficient legal provocation.  After the trial judge
 considered the issue and reviewed the case law overnight, he ruled against the
 request finding no sudden heat of passion.  He explained:

 [F]or the Court to charge voluntary
 manslaughter, the law requires a sudden heat of passion brought about upon
 sufficient legal provocation.
 I find
 in this instance that the evidence does not support a charge of voluntary
 manslaughter.  That the evidence presented by the Defense best supports a
 self-defense charge in that there is no evidence of any sudden heat of
 passion.  That the case law required some degree of assault, and in addition to
 that, something that might have provoked the killing.
 That in this
 case, at best, the Defendants testimony concerning the  what he thought was a
 presence of a gun, indicates possibly some provocation but it does not conjure
 up any sudden heat of passion.  That the prior incidents between parties could
 not create a sudden heat of passion, but any passion regarding that, in
 addition to the Defendants testimony about firing the shots regarding warning
 the Defendant [sic] or something of that nature, in and of itself does not
 indicate any sudden heat of passion and Im not going to charge manslaughter.  
 

STANDARD
 OF REVIEW
The
 law to be charged must be determined from the evidence presented at trial.  State
 v. Childers, 373 S.C. 367, 373, 645 S.E.2d 233, 235 (2006); State v.
 Cole, 338 S.C. 97, 101, 525 S.E.2d 511, 512 (2000).  Due process requires
 that a lesser included offense be charged when the evidence warrants it but
 only if the evidence would permit a jury rationally to find the defendant
 guilty of the lesser offense.  State v. Small, 307 S.C. 92, 94, 413
 S.E.2d 870, 871 (Ct. App. 1992).  In determining whether the evidence requires
 a charge on voluntary manslaughter, this Court must view the facts in the light
 most favorable to the defendant.   Childers, 373 S.C. at 373, 645 S.E.2d
 at 235.  To justify a courts eliminating the offense of manslaughter, it
 should clearly appear that there is no evidence whatsoever tending to reduce
 the crime from murder to manslaughter.  Id.  
DISCUSSION
Clea
 argues he was entitled to a charge of voluntary manslaughter given the facts of
 this case.  We disagree.  
Voluntary
 manslaughter is the unlawful killing of a human being in the sudden heat of
 passion upon sufficient legal provocation. Both heat of passion and sufficient
 legal provocation must be present at the time of the killing.  State v.
 Smith, 363 S.C. 111, 609 S.E.2d 528 (Ct. App. 2005) (citing State v.
 Cooley, 342 S.C. 63, 67, 536 S.E.2d 666, 668 (2000)).  The sudden heat of
 passion, upon sufficient legal provocation, which mitigates a felonious killing
 to manslaughter, while it need not dethrone reason entirely, or shut out
 knowledge and volition, must be such as would naturally disturb the sway of
 reason, and render the mind of an ordinary person incapable of cool reflection,
 and produce what, according to human experience, may be called an
 uncontrollable impulse to do violence.  State v. Walker, 324 S.C. 257,
 260, 478 S.E.2d 280, 281 (1996) (citing State v. Byrd, 323 S.C. 319, 474
 S.E.2d 430 (1996)).  When there is no evidence of sudden heat of passion upon
 sufficient legal provocation, the courts refusal to instruct the jury on
 voluntary manslaughter is proper.  Id.
Viewing
 the evidence in the light most favorable to Clea, we find he did not act in the
 sudden heat of passion.  Clea testified that, in the moments before the
 shooting, he was suspicious, walked away from the victims, stalled at his
 truck, negotiated with Jackson to come to his truck to speak, and asked to be
 allowed to leave.  We find these statements demonstrate cool reflection.  Clea explained
 he was heated up by Jacksons not showing his hands.  But, further
 strengthening our determination, he said he was just precautious and not mad. 
 Although he said Pollard provoked him by reaching into his waist, he again asserted
 he was not mad but simply defending himself.  See State v. Walker,
 324 S.C. 257, 478 S.E.2d 280 (1996) (no sudden heat of passion where defendant
 tried to diffuse argument and give victim time to cool off); State v. Rogers,
 275 S.C. 485, 272 S.E.2d 792 (1980) (defendants testimony he was not mad when
 he shot wife and stepdaughter, together with his insanity defense, precluded
 voluntary manslaughter charge); cf. State v. Wiggins, 330 S.C. 538, 500 S.E.2d 489 (1998) (evidence tended to show defendant acted in sudden heat of passion where he was in a heated argument
 with victim and feared for his life because victim threatened him); State v.
 Lowry, 315 S.C. 396, 434 S.E.2d 272 (1993) (holding a voluntary
 manslaughter charge was necessary where defendant and victim were in a heated
 argument and victim was about to initiate a physical encounter when shooting
 occurred); State v. Davis, 278 S.C. 544, 298 S.E.2d 778 (1983) (holding
 voluntary manslaughter charge was proper where a witness testified that
 defendant and victim had been fighting).
Because
 there is clearly no evidence to show Clea acted in the sudden heat of passion,
 we will not reach the issue of whether sufficient legal provocation existed. 
 
CONCLUSION
The
 trial judge properly found Clea did not act in the sudden heat of passion and
 did not err in refusing to charge the lesser included offense of voluntary
 manslaughter.  Accordingly, Cleas convictions are
AFFIRMED.
ANDERSON, SHORT AND WILLIAMS, JJ., concur.

[1]  We decide this
 case without oral argument pursuant to Rule 215, SCACR.